## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA**

        Plaintiff,

        v.                        Case No.: 6:19-CR-49-ORL-31EJK

**SEONGCHAN YUN A/K/A "STEVEN YUN"**

        Defendant.

_____/

## DEFENDANT YUN'S MOTION TO PRECLUDE ADMISSION OF PRIVILEGED COMMUNICATIONS WITH OUTSIDE COUNSEL FOR CBOL AND SUPPRESS HIS FEBRUARY 7, 2017 STATEMENTS TO THE GOVERNMENT

Defendant Seongchan Yun, A/K/A Steven Yun, by and through undersigned counsel hereby moves this Court to: 1) preclude admission, at trial, of privileged communications between Mr. Yun and outside counsel for CBOL; and 2) suppress the oral and written statements he made to the Government on February 7, 2017 as the product of Government action that tricked Mr. Yun into confessing and violated his Fifth Amendment rights.  In the alternative Mr. Yun requests a hearing on the matter, and in support of said motion would state as follows:

### FACTS

1) On April 3, 2014 and April 18, 2014, the National Aeronautics and Space Administration ("NASA") solicited price quotes for stainless-steel tubing and threaded rod.  [Gov't Disc. at 250, 2440].

2) On or about April 10, 2014 and May 2, 2014, STAT Industry, Inc. ("STAT"), a Florida company, submitted price quotes in response to those solicitations.  [Gov't Disc. at 127, 2410].

3) On May 16, 2014 and May 27, 2014, STAT won the NASA contracts for stainless-steel tubing and threaded rod. [Gov't Disc. at 250, 264].

4) The NASA contracts required that all stainless-steel tubing and threaded rod be of domestic origin. [Gov't Disc. at 250, 264].

5) On or about June 5, 2014, STAT sub-contracted the procurement of stainless-steel tubing and threaded rod to CBOL Corporation ("CBOL"), a California company that supplies parts to many industries, although primarily to overseas customers. [Gov't Disc. at 132].

6) As of June 2014, Defendant Yun was employed at CBOL. He had no prior experience or training on domestic contracts. He was and had always been assigned to the Republic of Korea group, responsible for exports to Korean clients. Despite this lack of experience and training, CBOL assigned Defendant Yun to work on the STAT contract. Working with Yun on this project were his team members, manager EA, and co-workers CY and MC.

7) On or about July 8, 2014, CBOL subcontracted with Specialized Metals, a Florida company, to supply the stainless-steel tubing. [Gov't Disc. at 3534].

8) On or about July 25, 2014, CBOL and Specialized Metals arranged for Specialized Metals to ship several crates of stainless-steel tubing from its office in Coral Springs, FL to a freight forwarder in Doral, FL called Powertrans Freight System, Inc. ("Powertrans Freight"). STAT industries was to pick up the stainless-steel tubing once received at Powertrans. [Gov't Disc. at 3488].

9) On or about July 25, 2014, Deborah Raney, the President of STAT[1], and Jonathan Hipps, an employee of STAT, drove to Powertrans Freight to examine the stainless-steel tubing. [Gov't Disc. at 678-679].

---

[1] Raney has not been charged with any crimes.

10) On or about July 25, 2014, STAT shipped the stainless-steel tubing from Powertrans Freight to NASA.  [Gov't Disc. at 1788].  The stainless-steel tubing arrived at NASA on July 28, 2014.  [Gov't Disc. at 1789].

11) For several reasons, upon receipt, NASA believed the tubing to be foreign made, thus violating the contracts with STAT.  [Gov't Disc. at 275].  For example, the stainless-steel tubing had markings for "JIULI[2]."  Moreover, the shipping crates held paperwork with "Jiuli" written on it ("NASA Jiuli Document") although the NASA Jiuli Document did not reference the tubing's country of origin.  [Gov't Disc. at 276].

12) On or about August 2014, NASA began investigating, among other things, the source of the stainless-steel tubing.  [Gov't Disc. at 275].

13) NASA procured a version of the Jiuli Document that identified the country of origin as China and also identified the supplier as Specialized Metals ("SM Jiuli Document"). [Gov't Disc. at 1533].

14) NASA investigated why the NASA Jiuli Document did not identify the country of origin (China) while the SM Jiuli Document did.  [Gov't Disc. at 1489-1491].

15) On March 30, 2016, NASA investigators flew to Los Angeles to interview Defendant Yun. They advised Mr. Yun that they were investigating STAT. Yun was never told he was the subject of the investigation or under suspicion. [Gov't Disc. at 896-898, 3927-3972].

16) On or about June 23, 2016, NASA officially provided CBOL with a Government-Industry Data Exchange Program ("GIDEP") Problem Advisory informing them that NASA was

---

[2] Jiuli is a well-known Chinese steel manufacturer.

investigating the circumstances of the production of foreign-made tubing and threaded rod. [Gov't Disc. at 1402, 1388-1389].

17) On or about July 11, 2016, an attorney with a nationwide law firm became outside counsel ("OC") for CBOL and contacted SA William Shores, the case agent in this investigation, to advise that he would be representing CBOL in the Government's criminal investigation and GIDEP inquiry.  [Gov't Disc. at 1381].

18) On July 23, 2016, CBOL, through its internal general counsel, responded to NASA's GIDEP Problem Advisory, blaming the problem of supplying Chinese parts to NASA on confusion.  [Gov't Disc. at 1388-1389].

19) On November 2, 2016, NASA Investigators interviewed former STAT employee Jonathan Hipps and asked about the differences between the NASA Jiuli Document and the SM Jiuli Document.  Hipps stated, in substance, that Deborah Raney, his boss and the owner of STAT, "blotted out" the Chinese address from the NASA Jiuli Document.  [Gov't Disc. at 1489-1491].

20) On December 6, 2016, AUSA James Mandolfo, the attorney assigned to the case for the Government, advised SA Shores that he planned to use the Grand Jury in January 2017 and expected to indict Deborah Raney by February 2017, and possibly Hipps.  [Gov't Disc. at 1543].  Defendant Yun was not named as a target, or subject in that discussion.  *Id.*

21) On December 8, 2016, SA Shores was given subpoenas to serve on Grand Jury witnesses. [Gov't Disc. at 1549, 1552].  One subpoena was addressed to Defendant Yun, who no longer worked for CBOL, and another subpoena was addressed to Elizabeth ("Ellie") Ahn, a current CBOL employee.  *Id.*

22) That same day, Defendant Yun, after conferring with his former CBOL manager and being

   told to speak with OC, had two phone calls with OC[3].  The OC also texted with Defendant

   Yun, ███████████████████████████████████[4].  *See*, Exhibit A.

23) On December 9, 2016, SA Shores served Ellie Ahn and Mr. Yun with subpoenas to testify

   in the Grand Jury.  [Gov't Disc. at 1549, 1552].

24) Per phone records, there were three telephone calls between Defendant Yun and the OC on

   December 9[5].  The OC and Defendant Yun also communicated via text, ███████████

   ████████████.  *See*, Exhibit A.

25) On December 10, 2016, at 14:30 hours, the OC texted Defendant Yun, "█████████

   ████████████████████████████████████████████████,"

   *Emphasis added*.  Defendant Yun responded, "████████████████████

   ████████████████████[6]."  *See*, Exhibit A.

26) On December 14, 2016, the OC advised Yun, via text, ██████████████████

   ███████████████████, the day before Mr. Yun was scheduled to testify before

   the Grand Jury.  The OC advised Yun to ██████████████████████████

   ████████████████████.  *See*, Exhibit A.



---

[3] The OC notified NASA in July 2016 that he would represent CBOL in the investigation.  [Gov't Disc. at 1381].  SA Shores' investigative reports highlight why CBOL may have hired counsel and why counsel was concerned about a criminal investigation of CBOL.  Specifically, CBOL had imported hundreds of times from "known or suspected counterfeit component sources."  Additionally, CBOL was the target of six (6) border seizures between 2010 and 2015.  [Gov't Disc. at 454].

[4] Separately, the Defendant is filing an Unopposed Motion to File Documents Under Seal.  Those documents will include an unredacted copy of this Motion, which includes privileged communications between Defendant and OC as well as a separate set of privileged text communications between OC and Defendant.  The Government does not oppose this Motion with the understanding that the Defendant will not oppose their request to respond to the Motion once a procedure is put in place for the Government to review all materials.

[5] The calls were for 4 minutes, 1 minute, and 1 minute.

[6] The ████████████ is to Yun's anticipated grand jury appearance in Orlando, and Yun's ██████████████ ████████████.

27) As of December 14, 2016, Mr. Yun reasonably believed that the OC was his attorney.  To that end: (1) he and the OC ███████████████████; (2) the next day, the OC advised Yun, "████████████████" about ███████████; (3) Mr. Yun told the OC, "████████████;" (4) the OC wanted to know ██████████████████ ████████; and (5) the OC had not advised Mr. Yun to obtain separate counsel and no written *Upjohn* warning exists in the Government discovery or in Mr. Yun's possession.

28) On December 19, 2016, despite Mr. Yun's belief that an attorney-client relationship existed between him and the OC, the OC called SA Shores and left a voicemail, asking SA Shores to call him back.  [Gov't Disc. at 1562].  The OC's later communication with SA Shores establishes that the OC was likely calling to disclose a possible admission that Defendant Yun had made to him.  *Id.*

29) On December 21, 2016, the OC texted Defendant Yun about ████████████████ ████████.  The OC did not █████████████████████████████.  *See*, Exhibit A.

30) On January 10, 2017, SA Shores returned the OC's call.  The OC advised SA Shores that: (1) neither the OC nor his firm represented Mr. Yun; (2) that he had spoken with Yun about the upcoming Grand Jury testimony; and (3) Yun made possible admissions regarding possible alterations to the NASA Jiuli Document.   [Gov't. Disc. at 1562].   The OC described Mr. Yun as a "babe in the woods."  SA Shores asked the OC to contact CBOL and inquire if any other versions of the documents were held by CBOL and not turned over as part of its Grand Jury production.  *Id.*

31) After speaking with the OC, SA Shores called Mr. Yun and asked whether he whited out or obliterated information on the NASA Jiuli document.  According to SA Shores' report

of interview with Yun that date, Yun was evasive and failed to acknowledge that he had whited out information from the mill test report. The call lasted eight (8) minutes[7]. One minute after hanging up, Yun called the OC and spoke with him for twelve (12) minutes[8].

32) The next day, January 11, 2017, the OC texted Yun and asked ████████ ████████. Mr. Yun called the OC and spoke with him for fourteen (14) minutes. *See*, Exhibit A.

33) Thereafter, still on January 11, 2017, the OC called SA Shores a second time. The OC advised that Yun called him on January 10, shortly after Yun had spoken with SA Shores. The OC informed SA Shores that Yun confessed to altering documents by whiting out information about China. *Id*. The OC further advised that CBOL found original documents on which China-related information was whited out. *Id*. Presumably, these are the same documents about which the OC texted Mr. Yun earlier in the day.

34) The next day, January 12, 2017, SA Shores advised AUSA James Mandolfo of Mr. Yun's possible admission. AUSA Mandolfo directed SA Shores to re-interview Mr. Yun. He advised that he would consider charging Yun separately from Deborah Raney and Jonathan Hipps. [Gov't Disc. at 1564]. Neither AUSA Mandolfo nor SA Shores discussed receipt or request for an *Upjohn* waiver from the OC regarding the representation of Mr. Yun or inquiring as to whether Mr. Yun had counsel. Until that point, Mr. Yun had not been a target of the investigation. However, after January 12, 2017, and only after the OC's two disclosures to the Government, which were premised on Yun's confidential disclosure of information to the OC, he clearly was.

---

[7] The call is listed with "Unknown."
[8] Yun was plainly calling OC for advice on how to proceed, given his conversation with SA Shores.

35) On January 12, 2017, SA Shores called Mr. Yun and requested a meeting the week of February 6, 2017.  Yun agreed.  [Gov't Disc. at 1562].

36) Thereafter, Mr. Yun texted the OC.  He said, ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████" *See*, Exhibit A, *emphasis added.*  Through this communication, Mr. Yun was clearly seeking advice from the person he believed to be his lawyer.

37) In response, the OC did not either advise Mr. Yun of the potential trouble he was facing, tell Mr. Yun to secure independent counsel, or advise Mr. Yun about his prior communications with SA Shores.  Instead, the OC wrote: "███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████." *See*, Exhibit A.

38) Thereafter, the OC presumably communicated with the Government about arranging Mr. Yun's interview.  Between January 12 and January 21, the OC and Mr. Yun engaged in several phone calls.

39) On February 6, 2017, the day before Mr. Yun was scheduled to meet with SA Shores, Mr. Yun, at the OC's request, met with the OC at a branch of his law firm in Los Angeles, to discuss and prepare for the next day's interview.  The OC texted Yun, "███████████████

████████████████████████████████████████████████████████████████████

███████████████." *See*, Exhibit A.

40) On February 6, 2017, Yun met the OC in Los Angeles.  Prior to that evening, Mr. Yun believed the OC to be his lawyer.  Moreover, he expected the OC to attend the February 7, 2017 meeting with SA Shores.  However, during the February 6, 2017 meeting, the OC advised ██████████████████████████████████████████████████████ ███████████████████████████.

41) Instead of advising Mr. Yun to get counsel or advising him of the risks he might face by speaking with SA Shores, the OC ████████████████████████████████████████.



After their February 6 meeting, at 8:34 PM, the OC texted, "████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████"  *See*, Exhibit A.

42) The next day, February 7, 2017, as arranged, Mr. Yun met with SA Shores and SA Polson in Torrance, CA.  [Gov't Disc. at 1610].

43) SA Shores never corrected the prior representation made to Yun on March 30, 2016 that the investigation was about STAT, or advised Yun that he was a target of the federal investigation.  Yun was never advised of his right to counsel until the end of the interview. SA Shores did not advise Mr. Yun of his communications with the OC.

44) SA Shores was clearly suspicious of Yun's motives, and CBOL.  At one point early in the questioning, SA Shores asked Mr. Yun, "Um, I talked to (the OC), he's the – have you talked to him recently?"  [Gov't Disc. at 3978].  *See also,* Exhibit B.  Had SA Shores completed this sentence, as he did at the end of the interview, by reminding Yun that the

---

[9] The irony cannot be lost on this statement.  Yun would be anything but "fine" after following this advice, but this encouragement was intended to overcome whatever hesitation Mr. Yun may have had in meeting the Government without counsel present.

OC was CBOL's attorney, it may have resulted in Mr. Yun terminating the interview until such time as he could determine what his rights were and obtain separate counsel.

45) SA Shores questioned the OC on the substantive facts and elicited certain admissions which had not been elicited during the March 30, 2016 interview.

46) At the same February 7, 2017 interview, and at the direction of SA Shores, to memorialize the conversation they had, Mr. Yun wrote a handwritten statement in the presence of NASA investigators.

47) After obtaining these confessions, SA Shores for the first time referred to the OC as "the attorney who's representing CBOL." [Gov't Disc. at 4003]. *See*, *supra*, paragraph 44.

48) Only after obtaining admissions from Yun did SA Shores advise, "there's a potential that people, CBOL employees, that you could face criminal penalties. Okay?" [Gov't Disc. at 4007, *emphasis added*]. *See also,* Exhibit B

49) Yun was surprised by the notion that he could be charged, and later responded, "There's a chance that I'll be charged too?...Wow." [Gov't Disc. at 4019]. *See also,* Exhibit B Plainly, Mr. Yun had been mis-advised as to the purpose of the meeting and not advised at all about the risks he was facing. He was led down a path to self -destruction.

50) Only after all of this did SA Shores finally disclose the OC's relationship. He stated, "Um, and this is the other thing to, um, (the OC), he represents CBOL…His – he's being paid to represent and protect them. Kay, he's not your attorney. Okay?" [Gov't. Disc. at 4020]. *See also,* Exhibit B

51) On March 23, 2017, Mr. Yun received a letter advising that he was a target of a Federal Grand Jury investigation. Apparently still not grasping that the OC was not his attorney,

Mr. Yun texted him, forwarding a picture of the target letter.  He advised, "███████ ████████████████████████"  *See*, Exhibit A.

## **ARGUMENT**

### 1. **All Communications Between the OC and Mr. Yun Are Subject to The Attorney Client Privilege and Must Be Kept Out of Evidence**

#### A)  **An attorney-client privilege existed between Defendant Yun and the OC**

52) In *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Supreme Court held that communications between company counsel and employees of a company are privileged. However, the privilege belongs to the company, not the individual employee. The company has the right to waive the privilege and share the results of internal investigations, including the potentially incriminating statements of employees. *See*, *Avoiding The Perils and Pitfalls of Internal Corporate Investigations: Proper Use of Upjohn Warnings*; February 11-14-2010, at 3.

53) Because of this risk, attorneys conducting investigations on behalf of a corporate entity must warn their interviewees that statements they make are subject to disclosure. These warnings are known as *Upjohn* warnings. *Id.*

54) At a minimum, a proper *Upjohn* warning informs the interviewee that: (1) the attorney is there to conduct a privileged and confidential interview of the employee; (2) the attorney represents the company, not the individual; (3) the company, not the individual, enjoys an attorney-client privilege with the attorney; and (4) the company may, as it sees fit, disclose the employee's information and statements to third parties, including the government. *Id.*

55) As a matter of good practice, *Upjohn* warnings are given in writing. This avoids the possibility that, as in the instant matter, the company employee mistakenly believes that corporate counsel is representing them individually or in conjunction with the corporation.

56) If corporate counsel fails to properly advise the employee of the scope of their representation, then, even if the attorney-client relationship does not legally exist, the privilege still applies if the client or would-be client reasonably believes that he is consulting a lawyer for the purpose of obtaining legal advice. *Wylie v. Marley Co.*, 891 F.2d 1463, 1471 (10th Cir. 1989). *See also*, *United States v. Drake*, 310 F. Supp. 3d 607, 618 (M.D.N.C. 2018) (the professional relationship between attorney and client hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice).

57) Thus, if corporate counsel fails to give a proper *Upjohn* warning and ensure that the employee understands them, the attorney-client privilege may apply to communications between the corporate attorney and the company employee because of the employee's (mistaken) belief that an attorney-client relationship exists.

58) An individual's subjective belief that he is represented is not, alone, sufficient to create an attorney-client relationship. *Id*. A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication. *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009). The putative client must show that his subjective belief that an attorney-client relationship existed was at least minimally reasonable under the circumstances. *Id*. *See also*, *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985).

59) In circumstances such as these, involving corporate counsel, Courts have outlined a multi-part test to determine whether information is covered by the attorney-client privilege. Specifically: (1) where legal advice of any kind is sought; (2) from a professional legal adviser in his capacity as such; (3) the communications relating to that purpose; (4) made

in confidence; (5) by the client; (6) are at his insistence permanently protected; (7) from disclosure by himself or by the legal adviser; (8) unless the protection be waived. *Ruehle*, 583 F.3d at 607, *citing*, *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992).

**B) Statements Between Mr. Yun and the OC Should Be Suppressed Based on Attorney-Client Privilege**

60) Defendant Yun's belief that he was represented by the OC is reasonable in light of the circumstances.  The attorney-client privilege applies to all communications between Mr. Yun and the OC and the OC should be precluded from testifying, at trial, as to the substance of any communication between him and Mr. Yun.

61) In this matter, the OC and Mr. Yun spoke on the phone the same day that AUSA Mandolfo advised SA Shores that he would present evidence to the Grand Jury in early 2017.  The OC and Yun ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  No written *Upjohn* warning exists from that meeting, and nothing in the text messages between the OC and Mr. Yun reflects an *Upjohn* warning.

62) The text messages between the OC and Mr. Yun establish just the opposite – that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and, based on their course of communication, had an objectively reasonable belief that the OC was representing him.

63) First and foremost, Mr. Yun apparently admitted to the OC that he altered documents at CBOL.  If Mr. Yun in fact made such an admission, he did so only because he believed the OC was his lawyer and by doing so there was no risk of bringing harm to himself. Thereafter, instead of advising Mr. Yun to seek counsel, the OC told him, "▮▮▮▮▮▮▮ ▮▮▮▮"  The use of the phrase "▮▮▮▮▮▮▮" confirms a relationship of trust and the

attorney's protection of Yun from legal consequences. Thereafter, and working against Yun's interests, the OC was actively involved in and communicating with the Government investigators to the detriment of his "client", Yun.

64) Later, when SA Shores called Yun to advise that the Grand Jury had been cancelled, Yun sought legal advice from the OC. He said, "" Instead of telling Mr. Yun that he could not offer him personal advice, the OC advised Yun: "

" *See,* Exhibit A. In this communication, the OC advised Mr. Yun as to the reasonableness of the Government's actions, and reassured Mr. Yun that Mr. Yun should go forward and willingly provide information to the Government.

65) Thereafter, Yun met with OC to discuss his upcoming interview with the Government. The night before Yun was scheduled to speak with SA Shores, the OC advised: "

" *See,* Exhibit A. These are the actions of an attorney, counseling a client.

66) The communications are privileged, and the privilege is intact. The OC should not be allowed to testify to any communications with Mr. Yun and, as will be discussed below, the OC should not have disclosed these communications to the Government. The combination of the OC and the agents working together served to trick Mr. Yun into believing he was not in trouble and that the course he was pursuing was risk free for him.

Such trickery must not be rewarded by allowing the Government to use Mr. Yun's statements to SA Shores in evidence against Yun at trial.

2. **Based on the Totality of the Circumstances, the Government Tricked and Coerced Mr. Yun's Confession in Violation of his Due Process and Fifth Amendment Rights**

67) In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Supreme Court warned that deliberate use of deception and manipulation by the police is incompatible "with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means. *Id*. at 303. Moreover, [A]s law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, [a court's] duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made." *Id*.

68) Earlier, in *Miranda v. Arizona*, 384 U.S. 436, 476 (1966), the Supreme Court expressly disapproved of deceptive stratagems such as giving false legal advice, stating "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."

69) Additionally, in *Miller v. Fenton*, 474 U.S. 104, 109-110 (1985), the Supreme Court stated that, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."

70) It is plain that CBOL's attorney, acting hand-in-hand with criminal investigators, deceived Mr. Yun into believing that he was receiving sound legal advice for his own benefit, when in fact the advice being received could not have been more harmful to Mr. Yun. Further, Government investigators and prosecutors knew that CBOL's attorney was actively

working on the extraction of information from Yun, and the delivery of Yun to federal authorities to self-incriminate himself (and hopefully, spare the corporation).  No attempts were made to confirm that CBOL's attorney had adequately informed Yun of the attorney's role in representing the company, and not Yun.  No target or subject letter was sent to Yun until after Yun was delivered to Government agents and the confession obtained.  Plainly the Government was waiting and working with the attorney, who was grooming and reassuring Mr. Yun that he did not have a problem and that he should cooperate with the investigators.  How else does one explain Yun's reaction when SA Shores advised him that he could face a criminal charge?  Here, the actions of the attorney became the actions of the Government.

71) Trickery or deceit is prohibited in the course of soliciting a confession to "the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and consequences of abandoning them." *United States v. Degaule*, 797 F. Supp. 2d 1332, 1380 (N.D.Ga. 2011) (internal quotation marks omitted0.  *See also*, *United States v. LaForgia*, No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D.Al. May 22, 2012) (a voluntariness analysis in circumstances of deception turns on whether the defendant was deceived about the nature of his rights or the consequences of abandoning them).

72) The use of a trusted individual, such as CBOL's attorney, who ingratiated himself to Mr. Yun, to trick someone into making a confession is strictly prohibited and requires suppression of any subsequently obtained statement.  *See*, *Leyra v. Denno*, 347 U.S. 556 (1954) (Government's use of a psychiatrist to visit accused, in actions leading up to the confession, required suppression of confession).  *See also*, *Spano v. New York*, 360 U.S. 315 (1959) (confession ruled involuntary where obtained by a policeman who was a close

friend of the defendant and who told defendant he would be in trouble unless defendant confessed).  *See also*, *Grant v. Wainwright*, 496 F.2d 1043 (5th Cir. 1974) (where doctor is sent to jail ostensibly to treat prisoner but extracts confession, confession is suppressed).

73) The Government bears the burden of proving that the statement here was freely and voluntarily given and not the product of trickery.  *See*, *1 McCormick on Evid. § 155* (7th Ed. (deception and trickery are factors to consider in determining whether voluntariness has been demonstrated).  The government will be unable to sustain that burden.

74) Although some degree of trickery is permissible in law enforcement questioning, in deciding whether the trickery improperly influenced the voluntariness of a Defendant's confession, Courts distinguish between intrinsic misrepresentations and extrinsic misrepresentations.  Intrinsic misrepresentations are misrepresentations as to the facts relevant to the case, such as the police overstating the quantum of evidence, or that a bystander has identified the defendant as a perpetrator of the crime.  These, intrinsic, misrepresentations are generally permissible.  By contrast, extrinsic misrepresentations are misrepresentations that go beyond the facts of the case and delve into other matters, such as legal advice.  Extrinsic misrepresentations are generally entitled to more weight in a voluntariness analysis than misrepresentations as to intrinsic facts.  *Id*.  *See also*, *United States v. Duvall*, 537 F.2d 15 (2nd Cir. 1976) (defendant erroneously told by AUSA that he would get 100 years in jail- such misstatement of the law resulted in suppression of confession).

75) Here, the totality of the circumstances, establish that the Government was a willing party to the trickery that convinced Mr. Yun to confess, that his confession was neither knowing

nor voluntarily, and that his oral and written statements of February 7, 2017, should be excluded.

76) In December 2016, January 2017, and February 2017, Mr. Yun sought legal advice from the OC. He believed the OC to be his lawyer and to be acting in his best interests. He was never told to secure independent counsel. He was never advised that the OC shared his potential confession with the Government. Rather he was told that the ████████ ███████████████, and then when meeting with SA Shores to put "████████ ████████████████████████████████████████████████████████████████ ████████" *See*, Exhibit A.

77) The Government, for its part, knew that Yun had trusted the OC, to his detriment. Why else would SA Shores, at the end of the interview with Yun, feel the need to advise Yun that the OC was not his lawyer?

78) Against this backdrop, the Government sought Mr. Yun's confession. Yun, who had been under subpoena to testify before the Grand Jury, and who was advised to speak with the Government, was never told that he had a choice.

79) Instead of clarifying Mr. Yun's relationship with the OC, or asking for an *Upjohn* waiver, SA Shores purposely avoided any further discussion about the relationship until after Yun confessed. [Gov't. Disc. 3978 - "Um, I talked to (the OC), he's the – have you talked to him recently?"]. *See also,* Exhibit B. Plainly, SA Shores caught himself before completing the sentence, "he's the lawyer for CBOL," as he did not want to focus on the OC's role as counsel for CBOL and not Yun, lest Yun reconsider speaking with him, or consider the need to obtain counsel. *Id.*

80) Only after Mr. Yun confessed did SA Shores finally tell Mr. Yun, "Um, and this is the other thing to, um, (the OC), he represents CBOL…His – he's being paid to represent and protect them.  Kay, he's not your attorney.  Okay?"  *Id*.

81) SA Shores' tactics are borne out through other evidence.  For example, as of January 12, 2017, the date when SA Shores disclosed Yun's potential admission to the US Attorney's Office, Yun was clearly a target, or at least a subject, of the Grand Jury investigation.  [Gov't Disc. at 1564 - where the AUSA advises SA Shores that he would consider indicting Yun separately from Deborah Raney and Hipps].

82) However, instead of advising Mr. Yun of his target status, SA Shores allowed Mr. Yun to persist in the understanding, previously articulated to him by SA Mazzella, that the case was about STAT and Yun was only a witness.  Prior to the interview, Yun was not advised to the contrary, not of his target or even subject status[10].

83)  Nor may the Government claim a separation between the conduct of the OC and the agent during the second interview somehow preserves the second interview's admissibility.  As demonstrated above, CBOL's attorney was working hand in hand with the Government to deliver Yun to the Government.  The Government cannot benefit here since the defendant's initial confession to the OC was obtained improperly.  As other Courts have stated, the use of coercive and improper tactics in obtaining an initial confession may warrant a presumption of compulsion as to a second one, even if the latter was obtained after properly administered Miranda warnings.  *United States v. Pritchette*, 219 F. Supp. 3d 379, 386 (S.D.N.Y. 2016), citing *United States v. Taylor*, 745 F.3d 15, 25 (2nd Cir. 2014).

---

[10] It is the policy of the Department of Justice to advise targets of a grand jury investigation of their internal designation and, more importantly, advise them of their rights.  *See,* DOJ Manual 9-11.151.

84) The rejection of the second-interrogation rule was expressed in *Missouri v. Seibert*, 542 U.S. 600, 613 (2004), where the Supreme Court noted the likelihood that an accused who confesses once will confess again and therefore, even if the second confession technically meets the requirements of law, it too must be suppressed if the misconduct associated with the first taints the second.

85) Prior to filing the instant motion, undersigned counsel communicated with AUSA Vincent Chiu, who represents the Government in this matter and advised that the Government opposes the relief sought herein.

WHEREFORE, for the reasons stated above, Defendant Seongchan Yun, A/K/A Steven Yun, respectfully requests that an evidentiary hearing be held on the matters set forth herein and that all statements made to the OC and to SA Shores be suppressed.

Dated:  June 29, 2019                                    Respectfully submitted,

*/s/ Todd Foster*
TODD FOSTER
Florida Bar No.: 0325198
tfoster@barnettbolt.com
**BARNETT, BOLT, KIRKWOOD, LONG**
**KOCHE & FOSTER, P.A.**
601 Bayshore Blvd. Suite 700
Tampa, FL 33606
Telephone: (813) 253-2020
*Attorney for the Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing with the Clerk of United States District Court, using the CM/ECF System on this 29th day of June 2019.

*/s/ Todd Foster*
TODD FOSTER