UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

 v.          CASE NO. 6:19-cr-49-Orl-31EJK

SEONGCHAN YUN

**<u>UNITED STATES' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO PRECLUDE ADMISSION OF PRIVILEGED COMMUNICATIONS WITH OUTSIDE COUNSEL FOR CBOL AND SUPPRESS HIS FEBRUARY 7, 2017 STATEMENTS TO THE GOVERNMENT</u>**

The United States of America, hereby responds to the Defendant's Motion to Preclude Admission of Privileged Communications with Outside Counsel for CBOL and Suppress his February 7, 2017 Statements to the Government.   Doc. 27.

### I. FACTS

On May 16, 2014, and on May 27, 2014, National Aeronautics and Space Administration (NASA) personnel at the John F. Kennedy Space Center (KSC) in Merritt Island Florida awarded NASA contracts NNK14EA54P and NNK14MA47P ("the NASA Contracts") to STAT Industry, Inc. (STAT).   As part of the NASA contracts, STAT agreed to supply NASA with stainless steel tubes, which were intended to transport rocket fuel to NASA's manned space vehicle as part of the Space Launch

System/Orion project. The NASA Contracts required that the materials provided, including the stainless steel tubes originate from the United States. On June 5, 2014, STAT employee Jonathan Hipps contacted CBOL Corporation (CBOL) to obtain the stainless steel tubes for use in the NASA contracts. Defendant Seongchan "Steven" YUN, an employee at CBOL, was assigned as the project manager for the order of stainless steel tubes. On July 25, 2014, STAT received the stainless steel tubes directly from CBOL's supplier ("the Supplier"). NASA received the tubing sometime between July 25, 2014 and July 29, 2014. On July 29, 2014, a NASA quality assurance employee found a mill certificate in the packaging of the stainless steel tubes, and noticed that all of the information regarding the origin of the materials had been redacted. The employee noted, however, the name "JIULI" on the paperwork (the "Juili document"). An internet search revealed a company called Jiuli Group in China that manufactures stainless steel pipes and tubes. On August 21, 2014, NASA notified STAT that NASA was rejecting the tubing because it appeared to originate from a foreign source.

On April 6, 2015, NASA Office of Inspector General (OIG) Special Agent (SA) Bill Shores interviewed Hipps, who stated that he ordered the stainless steel tubing from CBOL. Hipps stated he told CBOL that the materials had to be domestic only. On May 20, 2015, SA Shores interviewed

Hipps again, and Hipps named YUN as the employee with whom he worked to procure the contract materials.  Hipps stated he was asked if materials from China would work, since they would be cheaper.  Hipps stated he insisted to CBOL that the materials had to be domestic only.

On August 21, 2015, in response to a search warrant, NASA OIG investigators received emails from accounts belonging to STAT.  These emails confirmed that YUN was the CBOL employee who handled the orders pertaining to the NASA contracts.  The emails further confirmed that, on June 16, 2014, in response to YUN's suggestion of using materials from China, Hipps explicitly told YUN that the materials had to be domestic only.

On March 30, 2016, NASA OIG agents served CBOL with a grand jury subpoena for all documents pertaining to the STAT order.  That same day, investigators conducted a noncustodial interview of YUN, who was no longer employed at CBOL, at a restaurant in Los Angeles, California.  During the interview, YUN claimed that he did not realize the material had to be of domestic origin.  YUN was not asked about redactions on the documents, and he did not volunteer any information regarding redacting any documents.

On April 6, 2016, CBOL produced copies of documents responsive to the grand jury subpoena.  These documents include an unredacted copy of

the Jiuli document.

On July 11, 2016, outside counsel for CBOL ("the OC") contacted SA Shores and stated that the OC would be representing CBOL in matters pertaining to the investigation.

In November 2016, NASA OIG agents received records from the Supplier. Included with these records was an email from YUN requesting that the Supplier not include the "paperworks [sic]" in the actual shipment of stainless steel tubes, which was to be shipped directly to STAT. Also included with these records were an unredacted copy of the Jiuli document that the Supplier emailed to YUN prior to the shipment of the stainless steel tubing to STAT.

On December 9, 2016, investigators served subpoenas for testimony on YUN and YUN's supervisor, E.A. The subpoenas required them to testify before on January 18, 2017.[1] On December 22, 2016, YUN called SA Shores and left a voicemail asking for a return call.[2] On January 5, 2017, the OC called SA Shores and left a voicemail asking for a return call.

On January 9, 2017, SA Shores returned YUN's call. During the contact, YUN asked questions about what to expect during his scheduled

---

[1] Both YUN and E.A. were later excused from testifying before the Grand Jury.
[2] SA Shores was out of the office on leave between December 14, 2016 and January 9, 2017.

appearance before the grand jury. SA Shores advised YUN that he would be asked to provide details of the transactions pertaining to the order with STAT, including the stainless steel tubing.

On January 10, 2017, SA Shores returned the OC's call. During the call, the OC stated that, although neither he nor his firm were representing YUN, the OC had spoken with YUN about the transactions and the upcoming grand jury testimony. The OC advised that YUN had made possible admissions to him regarding alterations on mill test reports for the stainless steel tubing. The OC advised that YUN believed he might have redacted information on the mill test reports showing the tubing was from China. At the conclusion of the conversation, SA Shores confirmed with the OC that neither he nor his firm were representing YUN. SA Shores requested that the OC contact CBOL and inquire if CBOL possessed any other versions of the mill test reports that were not previously provided in CBOL's initial subpoena response.

On January 10, 2017, after speaking with the OC, SA Shores contacted YUN again by telephone. During the conversation, SA Shores asked YUN whether he redacted information from the mill test reports that would have indicated the Chinese origin of the stainless steel tubing. YUN stated he believed he redacted the information of the supplier, but did not definitively

respond as to whether he redacted information from the mill test report.

On January 11, 2017, SA Shores received a phone call from the OC. The OC advised that YUN had contacted him shortly after YUN's call with SA Shores. The OC advised that YUN stated that he believed he had altered the mill test repots by redacting the information showing the materials originated in China. The OC further told SA Shores that CBOL had located the original documents pertaining to the order of stainless steel tubing, which included the redacted copy of the Jiuli document.

On January 12, 2017, SA Shores called YUN and requested to meet with YUN the week of February 6, 2017. YUN agreed. On February 7, 2017, SA Shores and NASA OIG SA Todd Polson, met with YUN at a coffee shop in Torrance, California. *See* Attachment A (Transcript of Interview with Steven YUN). YUN voluntarily met with SA's Shores and Polson, who advised YUN of the noncustodial nature of the interview. The agents further advised YUN that he did not have to speak with them, and that he did not have to answer specific questions if he chose not to. YUN signaled his understanding with a nod of his head, and agreed to speak with the investigators. Later in the interview, YUN acknowledged that he had a Bachelor of Science degree in mathematics.

During the interview, which lasted approximately 72 minutes, YUN

admitted that he concealed information from the manufacturer's mill test reports for the stainless steel tubing. YUN admitted that he knew the materials were supposed to be domestic only. YUN further admitted that he knew the materials were intended for NASA prior to arranging for the shipment of the stainless steel tubing to STAT. YUN stated that he knew the stainless steel tubing was of foreign origin prior to their shipment to STAT. YUN acknowledged he had been speaking with the OC, most recently on February 6, 2017. YUN denied that anyone had instructed him on how to answer questions. At the conclusion of the interview, YUN agreed to make a written statement summarizing the statements he made during the interview.

## II.   MEMORANDUM OF LAW

**A.   The Defendant's Motion to Preclude Admission of Privileged Communication with Outside Counsel for CBOL should be denied as moot because the United States will not be introducing into evidence any communications made between the Defendant and the OC.**

The United States does not intend to introduce into evidence any communications made between the Defendant and the OC. As such, it is unnecessary for this Court to rule on whether such communications are admissible at trial, and should deny as moot the Defendant's motion with regard to statements between the Defendant and the OC.

**B.    The Defendant's motion fails to establish either a legal basis or a prima facie factual case supporting suppression of the Defendant's February 7, 2017 statements to agents, and his motion should be denied without need for an evidentiary hearing.**

The Defendant claims that his statements to SA Shores on February 7, 2017 were obtained in violation of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. Neither provision provides the Defendant the relief he seeks.

### 1. The Fifth Amendment is inapplicable because the Defendant was not in custody at the time of his questioning.

The Defendant's motion alleges that the Defendant's statement was obtained in violation of the Fifth Amendment. Doc. 27 at 15. The Defendant's reliance upon the Fifth Amendment is misplaced, however, because the Defendant's interview was non-custodial.

The Defendant's motion cites to *Miranda v. Arizona*, 384 U.S. 436 (1966) to support his Fifth Amendment argument. Doc. 27 at 15. *Miranda* provides that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Id.* at 444. The trigger for the protections of *Miranda* is the custodial nature of the interrogation. *Beckwith v. United States,* 425 U.S. 341, 346 (1976). "By custodial interrogation, we mean questioning

initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444.

The Defendant's motion does not allege that the Defendant's February 7, 2017 interview with agents was custodial in any way. To the contrary, the Defendant voluntarily met with agents in a coffee shop. At the beginning of the interview, agents informed the Defendant that his participation in the interview was voluntary, and that he was free to terminate the interview or refuse answer specific questions. Specifically, SA Shores told the Defendant: "…I wanted to let you know that this is voluntary. If you don't want to talk with me you don't have to…If I ask you questions and you don't want to answer, you'd rather not, that's fine. I'm not gonna think anything of it." Attachment A at 3-4. The entire interview lasted approximately 72 minutes, and the Defendant freely left at the conclusion of the interview.

Because of the undisputedly noncustodial nature of this interview, the Defendant's Fifth Amendment claim fails on its face.

   2. **The Defendant's Due Process Clause claims fail because the Defendant's statements were not the product of coercive police activity.**

The Defendant alleges that his statements were obtained in violation of the Due Process Clause of the Fourteenth Amendment because the OC acted

"hand-in-hand" with criminal investigators to deceive the Defendant "into believing he was receiving sound legal advice for his own benefit…" Doc. 27 at 15. The Defendant's claims are facially deficient, however, because he provides no specific factual allegations to show that his statements were the result of coercive police activity.

Even a noncustodial interrogation "might possibly in some situations, by virtue of some special circumstances, be characterized as one where the behavior of…law enforcement officials was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined…" *Beckwith*, 425 U.S. at 347-348. While the noncustodial nature of an interview is not necessarily dispositive of voluntariness, "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986); *see also Singleton v. Thigpen*, 847 F.2d 668, 671 (11th Cir. 1988).

To determine whether a confession is voluntary, courts must assess the totality of the circumstances—both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Factors to be considered include the defendant's intelligence, the length of his detention, the lack of any advice to the accused of his or her

constitutional rights, the repeated or prolonged nature of the interrogation, the use of any physical force against him (including the deprivation of food or sleep), or the use of any promises or inducements by police. *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996). Examining these factors, a court must ultimately determine whether the statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).

The use of deception by the police, taken alone, does not render a confession involuntary. *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984). Further, agents are not required to tell a Defendant about either the nature of their investigation or the Defendant's status as a target. *See United States v. Barner*, 572 F.3d 1239, 1244 (11th Cir. 2009)("the Supreme Court has 'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or to stand by his rights")(internal quotation omitted')(*citing Moran v. Burbine*, 475 U.S. 412, 422 (1986)); *see also United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010).

The Defendant's motion contains no facts establishing any collaboration between government agents and the OC to trick or deceive the

Defendant into making a statement.  According to the Defendant's motion, SA shores called Yun on January 12, 2017, and Yun agreed to meet with SA Shores the week of February 6, 2017. Doc. 27 at 8.  The Defendant's only allegation of coercive government action is the claim that, sometime prior to the February 7, 2017, interview of YUN, "the OC *presumably* communicated with the Government about arranging Mr. Yun's interview." Doc. 27 at 8 (emphasis added).  While rife with speculation and innuendo, the Defendant's motion fails to specify a single phone call, email, or other interaction between the OC and any government actor pertaining to the interview of the Defendant.

      Moreover, even if the Defendant had put forth facts to support his allegations, the Defendant provides no legal precedent to support the notion that collaboration between the OC and government actors would have rendered the Defendant's statement involuntary.  The Defendant points to *Leyra v. Denno*, 347 U.S. 556 (1954), to support his argument.  Doc. 27 at 16. The *Leyra* case, however, involved the police sending a psychologist in the guise of a doctor to provide treatment for the defendant's sinus condition, after the Defendant been interrogated for the better part of three days with little rest. 347 U.S. at 718.  The psychologist then continued the interrogation by "subtle and suggestive questions" while prosecutors and police listened from

an adjacent room. *Id*. The factual circumstances in *Leyra* bear no resemblance to the facts in the instant case. As discussed at length above, the totality of the circumstances of the Defendant's interview carry none of the hallmarks of coercion. The interview occurred in a non-threatening setting, agents made no express or implied threats or promises to the Defendant, and the interview was relatively short. The OC was not present at the interview, and had already informed the Defendant prior to the interview that the OC was not representing the Defendant.

Because the totality of the circumstances do not support a finding that the Defendant's involuntarily made his statement as the result of coercive government activity, the Defendant's Due Process claim fails.

### 3. No evidentiary hearing is necessary, because the Defendant's motion fails to establish a prima facie case of illegality.

The Defendant's motion fails to allege facts establishing a *prima facie* case of illegality, and therefore has failed to meet the burden of persuasion necessary to warrant an evidentiary hearing.

In *United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977)[3], the Fifth Circuit provided the following exposition on the often-confusing topic of

---

[3] Decisions of the Fifth Circuit decided prior to September 30, 1981, are binding precedent of this Court. Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

burdens of persuasion and proof regarding suppression motions:

> "It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. Concededly, in some well-defined situations, the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, if a defendant produces evidence that he was arrested or subject to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. Or if a defendant shows that a confession was obtained *while he was under custodial interrogation*, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination. Similarly, if a defendant seeks to suppress evidence as the fruit of an illegal wiretap and he proves that the tap was in fact unlawful, the burden shifts to the prosecution to prove that the evidence in question was obtained from another source and is not tainted by the illegal surveillance. The instant case, however does not fall within any of these established categories in which the government may bear the ultimate burden of persuasion. And even in those situations, the defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality."

*Id*. at 533-534 (emphasis added)(internal citations omitted).

Further, "where a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion." *United States v. Sneed*, 732 F.2d 886, 888 (1984). "A court need not act upon general or

conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985).

In the instant case, as laid out in the sections above, the Defendant has failed to satisfy his initial burden of persuasion to by failing to produce any specific factual allegations sufficient to make a prima facie showing of illegality.

### III.   CONCLUSION

For the reasons stated above, this Court should deny the Defendant's Motion to Preclude Admission of Privileged Communications with Outside Counsel for CBOL and Suppress his February 7, 2017 Statements to the Government without the need for an evidentiary hearing.

        Respectfully submitted,

        MARIA CHAPA LOPEZ
        United States Attorney

By:   */s/ Vincent S. Chiu*
        Vincent S. Chiu
        Assistant United States Attorney
        Florida Bar No. 0084936
        400 W. Washington Street, Suite 3100
        Orlando, Florida 32801
        Telephone:  (407) 648-7500
        Facsimile:  (407) 648-7643
        E-mail:  vincent.chiu@usdoj.gov

**U.S. v. Seongchan Yun**         **Case No. 6:19-cr-49-Orl-31EJK**

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Todd Foster, Esq.

    Matthieu Goddeyne, Esq.

    */s/ Vincent S. Chiu*
    Vincent S. Chiu
    Assistant United States Attorney
    Florida Bar No. 0084936
    400 W. Washington Street, Suite 3100
    Orlando, Florida 32801
    Telephone:  (407) 648-7500
    Facsimile:  (407) 648-7643
    E-mail:  vincent.chiu@usdoj.gov